UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
PAUL J. CAMERON et al.,                             )
                                                    )
                    Plaintiffs,                     )
                                                    )
v.                                                  )          Civil Action No. 08-12010-LTS
                                                    )
IDEARC MEDIA CORP., et al.                          )
                                                    )
                    Defendants.                     )
_____)


ORDER ON DEFENDANT IDEARC MEDIA CORP.'s
MOTION FOR SUMMARY JUDGMENT

September 9, 2011

SOROKIN, M.J.

        Pending is Defendant Idearc Media Corp.'s Motion Summary Judgment (Docket # 102).

For the following reasons, the motion is ALLOWED.

I.        PROCEDURAL AND FACTUAL BACKGROUND

        The Plaintiffs (Paul J. Cameron, Paul T. Ferris, Paul M. Gleason, Kevin O'Keefe and

Kenneth W. Rosenthal) were employed by Idearc Media Corp. (now known as SuperMedia

LLC).  Docket # 114 at ¶¶ 1,2.  The Plaintiffs were each over forty years of age at all relevant

times, and were employed as premise representatives, conducting in-person sales calls of

directory advertising (or "yellow pages").  Id. at ¶¶ 5, 41.  Plaintiff O'Keefe was also employed

in several other positions, including as a telephone sales representative and as a senior telephone

representative, the latter of which involved selling advertising mostly by telephone, but also

1

occasionally in person.  Id. at ¶ 6.  In 2006, Plaintiffs Cameron, Ferris, Gleason and Rosenthal

each earned over $100,000 from their employment with Idearc, and Plaintiff O'Keefe earned

more than $70,000.  Id. at ¶ 15.  Pension benefits were included among the Plaintiffs'

compensation packages.  Id. at ¶ 14.

The Plaintiffs were represented at all relevant times by Local 1301 of the

Communications Workers of America (the Union).  Id. at ¶ 8.  There was in effect between June

2, 2002, and June 2, 2007, a Collective Bargaining Agreement (CBA) between the Union and

Idearc's corporate predecessor, Verizon Yellow Pages Co.  Id. at ¶ 9.  Bargaining for a successor

agreement between the Union and Idearc began in April, 2007.  Id. at ¶ 11.  The 2002 CBA was

extended by agreement to June 23, 2007, at which time it expired.  Id. at ¶ 9.   A new CBA was

entered into on December 7, 2008.  Id. at ¶ 10.   There was no CBA in effect in the period

between June 23, 2007, and December 7, 2008.  Id. at ¶ 11.

Prior to the 2002 CBA, Idearc's sales employees were not subject to termination for poor

performance, and in the negotiation of the 2002 CBA, Idearc sought the right to eliminate under-

performing sales employees.  Id. at ¶ 22.  The 2002 CBA contained a Minimum Standards Plan

(MSP) giving Idearc authority to terminate employees failing to perform under the MSP.  Id. at

¶ 22; Docket # 138 at 14 ff.  The CBA capped terminations pursuant to the MSP at 7.5% of the

Sales Representatives in a "peer group."[1]  Docket # 138 at 15.  Employees who chose not to be

subject to the MSP were eligible for an enhanced early retirement package.  Docket # 114 at ¶

23.  The MSP tracked (based upon customer contracts submitted by the sales representatives)

---

[1] There were seven "peer groups" organized into three "channels" - premise, senior
telephone and telephone sales.  See Docket # 138 at 14.

"peer group" rankings based on "net gain" in sales during semi-annual periods.  Id. at ¶ 25.

Percent Net gain is defined as the revenue produced by accounts assigned to a salesperson in the

current directories divided into the value of revenue sold by the salesperson to those customers

and to new advertisers.  Id.

To pass a semi-annual marking period, an employee had to achieve either Idearc's

unilaterally-set net gain objective, or the "percentile" ranking set out in the 2002 CBA.  Id. at ¶

29.[2]  That percentile was set initially at the thirtieth percentile, but the 2002 CBA provided that if

employees were not identified for termination during the prior year at the rate of ten-to-fifteen

percent "within each channel," the percentile could be raised. Docket #107-1 at 6.  The CBA

also provided for reviews of the percentile in January, 2005, and again in January, 2007.  Docket

# 114 at ¶ 30.  By 2005, only one employee had been terminated.  Id. at ¶ 31. The MSP

percentile was raised to the seventieth percentile for the first term of 2005 and was left

unchanged through the first term of 2007.  Id. at ¶ 32.  In deposition testimony, the Union

conceded that Idearc had the right under the CBA to raise the percentile to seventy percent in

2005, although the Union opposed that change.  Id. at ¶ 33.

An employee was subject to termination under the MSP if four conditions were met:

(1) if he failed two of three six-month periods; (2) if he also failed at least two of the four six-

month periods in the "look back period" (that is, the four six-month periods preceding the first

failed six-month period in the initial review); (3) if when more than 7.5% of his peer group is

---

[2]  Although the Plaintiffs' Rule 56.1 statement states that this paragraph is "disputed," the
explanation following reveals that the dispute concerns additional facts which the Plaintiffs
believe provide important additional context.  The Defendants' factual assertion, however, is not
disputed.

identified for termination, he is in the lowest 7.5%; and (4) if the employee either does not appeal his termination, or his appeal is denied pursuant to Article 46 of the CBA (which establishes a joint union/management Performance Plan Review Board which could grant relief from the plan under specified circumstances).  See Docket # 138 at 15.

Each of the Plaintiffs (in the Company's view) failed the requisite number of six-month periods under the MSP and became subject to termination. Docket # 46. O'Keefe was terminated in January, 2007, and the remaining Plaintiffs were terminated in July, 2007.  Docket # 24-1. The Performance Review Board denied each of their appeals. Docket # 114 at ¶¶ 54-58.

The Plaintiffs filed suit on December 3, 2008.  Docket # 1.  Three claims against Idearc are currently pending: Count One, for age discrimination pursuant to 29 U.S.C. § 621 et sq. (the ADEA, the Age Discrimination in Employment Act of 1967); Count II, for age discrimination pursuant to M.G.L. c. 151B; and Count XI for violation of  Section 510 of ERISA (the Employee Retirement Income Security Act of 1974).  See Docket #s 24-1, 89; 79-1; 76.

II.     DISCUSSION

All three of the Plaintiffs' remaining claims rest on a similar theory – that Idearc's actions were motivated or designed either to terminate older workers or to terminate workers because of looming pension benefits.  Idearc asserts that the claims are barred (in the case of the federal claims) or preempted (in the case of the state law claim) pursuant to Section 301 of the Labor Management Relations Act because the Plaintiffs' claims arise out of, and require interpretation of, the collective bargaining agreement.  In addition, Idearc asserts that there are no genuine disputes of material fact, and that it is entitled to judgment as a matter of law under the ordinary analysis applicable to the discrimination and ERISA claims.

<u>Standard of Review</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir.1995)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir.1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir.2009).

<u>The Plaintiffs' Theories of Age Discrimination</u>

The Plaintiffs' theories of age discrimination are as follows: that Idearc "violated" the CBA by increasing the MSP to 70%, without a legitimate "mathematical" basis; that in so doing, Idearc knowingly rendered more employees terminable than was necessary to meet the benchmarks established in the CBA, thereby providing Idearc with a large pool of employees from which it could "cherry pick" the older, more-expensive employees (both in terms of salary and pension benefits) to terminate; that only twenty-eight of the seventy-five employees eligible for termination were actually terminated (demonstrating, in the Plaintiffs' view, the cherry picking and bias against older workers); that of the various employee groups subject to the MSP, the youngest group (D-T1), was "unilaterally" excluded from termination by Idearc, illustrating

(according to the Plaintiffs), Idearc's discrimination; that Idearc failed to apply a weighted average analysis to the MSP calculations for employees making sales in two or more groups within one semester, resulting in the possibility that four of the plaintiffs unnecessarily failed a semester;  that there was a "correlation" between age and chance of termination and (more generally) that the entire MSP system was not effective at identifying poor performers because the Plaintiffs were successful performers.

The central question presented by the Plaintiffs' theories is whether there is a genuine issue of material fact concerning the alleged "cherry picking."  There is not, for at least three reasons.

First, the alleged violation of the CBA by raising the MSP to seventy percent is largely irrelevant.  This is not an action for breach of the collective bargaining agreement – no such claim is presently pending.  Proof of violation of the CBA, in any event, would establish only a contractual violation -- it would not establish discrimination.  Even accepting arguendo that Idearc cast a wide net,[3] that practice would not in and of itself be discriminatory – the relevant question would be how Idearc treated employees in that net,[4] i.e. did it "cherry pick"  older workers for termination.

Second, even accepting the Plaintiffs' argument that the MSP identified seventy

---

[3] The contention appears in any event to be unsupported by the record.  The CBA permitted Idearc to set the percentile at a level sufficient to capture 10-15% of the employees within each channel. Docket # 107-1 at 5. The Plaintiff's expert erroneously recites the provision as permitting them to target 10-15% of the sales force annually and then draws his conclusion based upon his incorrect assumption.  Docket # 126 at ¶ 9; Docket # 126-1 at 57.

[4] While the reason Idearc elected to increase the MSP threshold to seventy percent might constitute evidence informing a determination regarding the reason for termination under the MSP, the focus remains the termination decision.

employees for termination while only twenty-eight were terminated, the Plaintiffs fail to

establish an inference of discrimination from these facts.[5]  The Plaintiffs present no evidence

regarding the employees whom they assert were identified for termination, but not terminated.

The Plaintiffs make no argument at all concerning a highly-probative fact --- the average age of

the twenty-eight individuals identified for termination, relative to the seventy-five individuals

they claim were identified as having failed the MSP.   Without evidence that they were younger,

(or further from vesting in pension benefits) than were the terminated employees, the Plaintiffs

have failed to carry their burden of proof.  There is simply no evidence of an improper selection

process which was biased against older workers.  Idearc adduces evidence that of the twenty-

eight employees who were terminated, twenty-two appealed their termination, eight successfully.

Docket # 104 at ¶ 70 (citing Docket # 107 at ¶ 45)  It points out that the average age of those

who successfully appealed their MSP-based terminations was higher than the average age of

those who unsuccessfully appealed.  Docket # 107 at ¶ 41.  Although the Plaintiffs dispute the

actual numbers, even on the Plaintiffs' numbers those who successfully appealed were older, on

average, than those whose appeals were unsuccessful.  Docket # 114 at ¶ 75.

---

[5]  While the parties agree that twenty-eight individuals were identified for termination by
Idearc, there is a dispute as to the number of individuals who failed the MSP.  Idearc references
an additional seventeen employees who failed the MSP, but were not eligible for termination
because seven resigned prior to termination and ten were above the 7.5% cutoff of employees in
the peer group who could be terminated.  See Docket # 128 at ¶ 23.  While the Plaintiffs
therefore identify thirty more employees who failed the MSP than Idearc does, the Plaintiffs do
not tell us anything about their ages, and so the discrepancy is of no probative value (for the
reasons discussed, supra).  According to Idearc, the discrepancy is attributable to the Plaintiffs'
expert's misreading of certain provisions of the CBA.  See, e.g., Docket # 136 at 9. Clearly, the
Plaintiffs expert includes within the seventy-five "21 failed-and-left-the-company." Docket
#126-1 at 57.  Persons who are failing and leave prior to a termination decision by the Company
are not evidence that in making the termination decision, the Company cherry picked older
workers to terminate because these persons were not available in the pool to be considered.

There was no significant difference in the proximity of qualification for service pensions between those employees whose appeals were granted, and those who were denied (67 months from the time of decision, and 68.18 months, respectively). Docket # 104 at ¶ 76 (citing Docket # 107 at ¶ 43); Docket # 114 at ¶ 76. Two employees whose appeals did not meet the criteria established in Article 46 of the CBA for relief from the Plan were nevertheless permitted to retain their employment when the Union called to Idearc's attention (via the grievance process) that their discharge would occur in close proximity to their qualification for a service pension. Docket # 104 at ¶ 71 (citing Docket # 107 at ¶¶ 36, 46): Docket # 114 at ¶ 71. This undisputed evidence directly contradicts the Plaintiffs' core assertion that the MSP was applied in a manner designed to target older employees as a means of preventing them from qualifying for their pensions. Accordingly, the results of the appeals process fails to support an inference of discrimination.

Third, the treatment of the telephone sales group does not assist the Plaintiffs. The undisputed evidence establishes that Idearc terminated no one from the telephone sales group during the 2002-2007 period pursuant to the MSP and that the employees in this group were decidedly younger than the employees in the groups in which the Plaintiffs worked. Nonetheless, in this case, these facts do not give rise to an inference of discrimination.

Idearc did not apply the MSP to the telephone sales group (# 137 at ¶ 5) although it did maintain the MSP data. Id. at ¶ 19. A Letter Agreement to the 2002 CBA provided that performance in 2002 of these employees would be "managed on an individual basis." Id. at ¶ 6 (citing Docket # 137). It also provided for the development of minimum standards for these employees for 2003. Id. Idearc measured these employees' performance by stack rankings. Id.

at ¶ 15. More importantly, probationary employees were subject to termination without recourse to the arbitration process within the CBA. In 2002 "almost all" of the telephone sales employees were probationary employees. Id. at ¶ 7. Sixty-eight telephone sales employees separated from Idearc during the relevant time, for a variety of reasons. Id. at ¶¶ 13-14. Of the seventeen terminated for performance, "[a]ll" were probationary employees. Id. at ¶ 17. In light of these undisputed facts,[6] the fact that Idearc did not apply the MSP to the Telephone Sales Group does not support an inference of discrimination because it is not evidence that Idearc shielded them from performance-based termination, as argued by the Plaintiffs.

Consideration of the Telephone Sales Group also does not advance the Plaintiffs' case. Seventeen such employees were terminated for performance reasons (though not for failing the inapplicable MSP performance measure). Applying the Plaintiffs' expert's statistical analysis, the Termination Ratio for the Telephone Sales Group is 28.1 compared to the 6.44 the expert calculated for the Premise A P2 group or the 5.34 for the entire Premise channel. See Docket #126-1 at 59. Thus, per the calculation suggested by the Plaintiffs, there is a 400-500% greater

---

[6] The Plaintiffs raise a number of challenges to these facts. They complain that the affidavits and argument came, improperly, in Idearc's reply. Idearc's reply submissions were fairly responsive both to the arguments made by the Plaintiffs in their opposition and to the material facts advanced by the Plaintiffs in their Rule 56.1 Statement of Facts, submitted with their opposition. Moreover, the Plaintiffs have had the opportunity to respond. They have submitted a Motion to Strike which contains substantive argument on the issues along with evidentiary attachments. The Plaintiffs have also had an ample opportunity to request leave to submit supplemental filings in response to the reply.

Next, the Plaintiffs assert that the affidavits stating that the MSP did not apply to the Telephone Sales Group contradict the CBA itself as well as both Idearc's Rule 56.1 statement and an earlier affidavit submitted by Idearc. Docket # 145 at 4-7. This is incorrect. The earlier affidavit simply recites the fact that the sales force is divided into seven peer groups by the MSP. The letter agreement appended to the CBA, however, reflects that the Union and Idearc agreed that a different set of minimum standards would then be applied to the Telephone Sales Peer Group, other than that set of standards contained in the MSP.

chance of performance-based termination for the younger employees in the Telephone Sales Group than for the older Premise channel employees where the Plaintiffs worked.[7] That Idearc applied to younger probationary workers a more rigorous performance measure resulting in a higher rate of termination than to other older workers enjoying greater protections under the CBA is both unsurprising and unsupportive of a claim for age discrimination. In light of this, the Plaintiffs' expert's contention that the <u>peer group</u> with the highest average age and length of service suffered a disproportionate share of terminations (<u>See</u> Docket #126 at ¶¶ 38-42) is without merit.

Accordingly, the Plaintiffs have not submitted evidence sufficient to support the conclusion that Idearc "cherry picked" older workers to terminate, that Idearc applied a more-rigorous performance-based standard to older workers as compared to younger workers, or that Idearc's termination decisions were infected by improper age considerations. Under the relevant law explained below, this is fatal to the merits of the Plaintiffs' age discrimination claims.

**<u>Age Discrimination Claims</u>**

<u>Analytical Framework</u>

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation,

---

[7] Plainly, either the Court considers the evidence regarding the application of the MSP (in which case the treatment of the Telephone Sales Group is irrelevant as it was not applied to them) or else the Court considers the performance-based terminations of all of the sales employees under the MSP as well as the non-MSP performance-based terminations of the Telephone Sales personnel. Neither approach suggests age discrimination. One analysis would be improper – that is, to analyze the terminations of all the employees (including the Telephone Sales Group) under the MSP and to disregard the performance-based terminations of the Telephone Sales Group employees that occurred in lieu of application of the MSP to them. Such was the approach followed by the Plaintiffs' expert. Docket #126-1 at 59.

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1).  "A plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove,

by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse

employment action."  Gross v. FBL Financial Services, Inc., — U.S. ---- 129 S.Ct. 2343, 2352

(2009).  "The burden of persuasion does not shift to the employer to show that it would have

taken the action regardless of age, even when a plaintiff has produced some evidence that age

was one motivating factor in that decision."  Id.   A plaintiff may meet his or her burden of

persuasion by reference to direct or circumstantial evidence.  Id. at 2351 n. 4. ("There is no

heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion that

age was the "but-for" cause of their employer's adverse action, see 29 U.S.C. § 623(a), and we

will imply none. "Congress has been unequivocal when imposing heightened proof

requirements" in other statutory contexts, including in other subsections within Title 29, when it

has seen fit").

As in other types of employment discrimination cases, age discrimination plaintiffs rarely

possess "smoking gun" direct evidence, and the Plaintiffs in this case are no exception.  ADEA

plaintiffs who do not have "smoking gun" direct evidence may nevertheless prove their cases by

using the three-stage burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802 (1973).[8]

In the context of an ADEA claim for discriminatory firing, this requires a plaintiff to

---

[8]  Although the Supreme Court has yet to decide the issue of the applicability of the
burden shifting framework to ADEA cases (See Gross, 129 Sup. Ct. at n.2), the First Circuit has
long applied the McDonnell Douglas burden-shifting framework to age discrimination cases.
See, Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 n.2. (1st Cir.2009).

show that: 1) he was at least 40 years old at the time he was fired; 2) he was qualified for the position he had held; 3) he was fired, and 4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services. Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir.2009). The showing required to make a prima facie case has been described as "modest" and a "low standard." Id. A plaintiff making the prima facie showing is entitled to a presumption of age-based discrimination. Id.

The burden of production then shifts to the employer "to articulate a legitimate, non-discriminatory reason for its decisions." Id. (quoting Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 219 (1st Cir.2008)). If the employer articulates such a reason, "the McDonnell Douglas framework-with its presumptions and burdens-is no longer relevant." Velez, 585 F.3d at 447 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).

At the third stage, "the sole remaining issue [is] discrimination vel non"(i.e., "or not") and a plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Velez, 585 F.3d at 448 (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).

The same analytical framework has been adopted by the Supreme Judicial Court with regard to the analysis of state law discrimination claims brought pursuant to M.G.L. c. 151B.[9]

---

[9] There is one difference applicable to analysis of state law age discrimination claims. While the Supreme Court has ruled that the mixed motive analysis of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) does not apply to ADEA claims (See Gross, 129 S.Ct. at 2351), under Massachusetts law, a mixed-motive analysis may still be appropriate. This case does not present this issue, however, because the state law claim is not viable for the reasons discussed infra. at 14-15.

See <u>Wheelock College v. Mass. Comm'n Against Discrim.</u>, 371 Mass. 130, 138 (1976).

### Age Discrimination Analysis

Assuming without deciding that the Plaintiffs have established a prima facie case at stage one of the analysis, the Plaintiffs nevertheless fail to meet their stage three burden of demonstrating by a preponderance of the evidence that age discrimination was the true reason for Idearc's employment action, and that age discrimination was the "but-for" cause of their employer's adverse action. The factual record contains insufficient evidence for a reasonable jury to so conclude.[10] As already explained, the evidence simply does not support this conclusion. A few additional points do bear comment.

The Plaintiffs' expert objects to the MSP. The expert asserts that the MSP is not <u>mathematically</u> supported. The law imposes no such requirement. This is neither a dispute about math principles nor a breach of contract action regarding the application of the MSP. The question is whether evidence -- mathematical or otherwise -- supports the conclusion that Idearc made termination decisions based upon age. The Plaintiffs' expert asserts that the MSP does not effectively (or most precisely) identify non-performing employees. The CBA, however,

---

[10]  The only direct evidence of age discrimination offered by the Plaintiffs is a 2005-2006 remark by a sales manager in response to a suggestion by Plaintiff Rosenthal to the effect that, "that's the problem with you old guys, you remember the way it used to be." <u>See</u> Docket # 104 at ¶¶ 68-69; the Plaintiffs concede that the speaker advocated on Rosenthal's behalf during the appeals process and was not the decisionmaker in the appeals process. <u>Id.</u> at ¶ 69; Docket # 114 at ¶ 69. This stray remark by a non decisionmaker is not probative of pretext. <u>See</u>, <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 36 (1st Cir.2001) (citing <u>McMillan v. Massachusetts Soc'y for Prev. of Cruelty to Animals</u>, 140 F.3d 288, 300 (1st Cir.1998))(remarks by a superior in a position to influence the key decisionmaker could be probative of employer's discriminatory intent, but probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by non decisionmakers). All three of these factors are present here, and the speaker also attempted to influence the decisionmaker in the plaintiff's favor.

provides for the MSP. The Union and Idearc can, and did, agree to measure non performance via the mechanism of the MSP. That the expert believes the measure selected is a poor one is immaterial to the question of age discrimination. The expert sees error in Idearc's failure to perform "weighted averages" when, in a given semester, an employee generated sales in multiple peer groups or the employee moved between two peer groups. The Plaintiffs present no evidence, however, that the failure to perform this analysis disfavored older workers.[11]

Accordingly, the Plaintiffs' age discrimination claims fail on the merits.

<u>Viability of State Law Age Discrimination Claim</u>

The Plaintiffs' state law age discrimination claim fails for an additional separate reason.

The Court previously denied without prejudice Idearc's motion for judgment on the pleadings with regard to Count II (age discrimination under M.G.L. c. 151B). At that time, prior to discovery, the record was sparse and the Court was unable to determine whether or not resolution of that claim would require interpretation of the CBA, in which case the claim would be preempted. <u>See</u> Docket # 76 at 3 (citing, inter alia, <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399 (1988)). Rather than casting their claim away from interpretation of the CBA, the Plaintiffs have taken the opposite tack. Each of the arguments advanced by the Plaintiffs requires interpretation of the CBA.

For example, the Plaintiffs argue that Idearc had no basis under the CBA for raising the MSP from 30% to 70%. Docket # 113 at 6. In making this argument, the Plaintiffs' expert makes mathematical arguments concerning "the quality and integrity of the statistical processes

---

[11] That the "weighted averages" analysis "may," according to the expert, have benefitted four of the named plaintiffs, had Idearc applied it to every employee, was perhaps a matter to grieve under the CBA, but is not material to the issues before the Court.

used by Idearc, <u>as they relate to the agreed-upon terms with the employees' union, as stated in</u> <u>the collective bargaining agreement</u>." (emphasis added) Docket # 126 at ¶ 3.  He then proceeds to interpret the CBA.  <u>See</u>, <u>e.g.</u>, <u>Id.</u> at ¶ 17  ("the Company then claimed that raising the percentile to the 100th percentile was within the Company's rights" . . .  [t]his makes no sense because . . .); <u>Id.</u> at ¶¶ 27-30 ("the CBA clearly specified that employees' work, when distributed across two or more cohorts in a given semester, should be treated in a unified fashion, and it is incumbent on the Company to explain why this was not done").   The majority of the Plaintiffs' arguments that Idearc's conduct was discriminatory under stages one and two of the burden-shifting analysis similarly can be assessed only by reference to the CBA.  Accordingly, the state law age discrimination claim is preempted, and Idearc is entitled to judgment as a matter of law on Count II.

<u>The ADEA Claim</u>

<u>Viability of the Claim</u>

Federal labor policy also bars the Plaintiffs' ADEA claims, although not all ADEA claims are so stymied.  The Court has previously dismissed claims made by the Plaintiffs against the Union (for breach of the duty of fair representation) and against Idearc (for breach of the CBA) because they failed to bring a timely claim against the Union, a defect fatal to both claim types within a so-called hybrid Section 301 claim. <u>See</u> Docket #s 56, 76.  Advancing an argument similar to that made previously with regard to preemption of the state law age discrimination claims, Idearc additionally argues that the Plaintiffs may not simply recast their dismissed CBA-based Section 301 claims as a statutory federal tort claim (essentially alleging that Idearc violated the CBA for a discriminatory purpose) because the ADEA claim is based

upon allegations of violations of the CBA, the analysis of which requires the Court to interpret the CBA in violation of federal labor policy.  See Docket # 136 at 3-5 (citing, inter alia, Vadino v. A. Valey Engineers, 903 F.2d 253, 266 (3rd Cir.1990) (holding in context of Fair Labor Standards Act (FLSA) claim that "claims which rest on interpretations of the underlying collective bargaining agreement must be resolved pursuant to the procedures contemplated under the [Labor Management Relations Act] LMRA, specifically grievance, arbitration, and, when permissible, suit in federal court under section 301"  . . .  Unfortunately for Vadino, his section 301 claim was untimely. He cannot remedy that defect by establishing in the claim brought under section 7(a) of the FLSA that which he should have established under section 301 of the LMRA").

In Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962), the United States Supreme Court stated that the "dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute [so that] issues raised in suits of a kind covered by § 301 [are] to be decided according to the precepts of federal labor policy." Id. at 104.  Thus, "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law."  Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985).  The Supreme Court noted in the context of Section 301's preemption of state-law tort derivative tort claims that the doctrine preserves the central role of arbitration in our "system of industrial self-government."  Id. at 219 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581 (1960).  It noted that absent preemption, the arbitrator's role could easily be bypassed in "[c]laims involving vacation or overtime pay, work assignment, unfair discharge

16

– in short, the whole range of disputes traditionally resolved through arbitration."  <u>Id.</u> at 219-20.

"A rule that permitted an individual to sidestep available grievance procedures would cause

arbitration to lose most of its effectiveness, as well as eviscerate a central tenet of federal

labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to

interpret the labor contract in the first instance."  <u>Id.</u> (citation omitted).

 Although the Plaintiffs' ADEA claim does not present a preemption question since it

arises under federal law, it does nevertheless implicate the policy that labor contracts are to be

resolved by reference to uniform federal law.

 The majority of the evidence adduced by the Plaintiffs in support of their ADEA claim

(<u>i.e.</u>, their evidence at the prima facie stage that they were qualified, and at the second stage that

Idearc's stated reason for their termination was not legitimate) is evidence relating to the terms

of the CBA.  As such, resolution of the Plaintiff's claim is dependent to a large degree on

interpretation of the CBA itself.   The Court therefore concludes that this ADEA claim is barred

as a claim resting upon interpretations of the underlying collective bargaining agreement, a type

which must be resolved pursuant to the procedures contemplated under the LMRA (<u>i.e.</u>,

grievance, arbitration, and, suit under section 301).  In this case, the Plaintiffs no longer have a

viable section 301 suit, but they may not avoid the requirements of section 301 by recasting their

CBA-based claim as one to be remedied under other statutory schemes.

 Not every claim under the ADEA would necessarily be barred as a matter of labor policy

merely because it tangentially involved a CBA.  <u>See</u>, <u>e.g.</u>, <u>Wright v. Universal Maritime Service</u>

<u>Corp.</u>, 525 U.S. 70 (1998).  Unlike the case at hand, however, Wright was a case which

"ultimately concerns not the application or  interpretation of any CBA, but the meaning of a

federal statute." Id. at 78-79. As noted supra, the Plaintiffs' ADEA claim, as framed by them, ultimately concerns interpretation on the CBA. The Defendant is entitled to judgment as a matter of law on Count I.

ERISA Claim - Discrimination Theory

The Plaintiffs' remaining claim is for violation of Section 510 of ERISA (the Employee Retirement Income Security Act of 1974) which provides in relevant part that "[i]t shall be unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.

The framework for analysis of the Plaintiffs' ERISA claim is essentially the same as that discussed, supra, with regard to the ADEA claim. The McDonnell Douglas burden shifting framework, for example, is also utilized with respect to the ERISA claim. Kouvchinov v. Parametric Technology Corp., 537 F.3d 62, 67 (1st Cir.2008). An employee who claims to have been dismissed in violation of section 510 must carry the burden of proving that the firing "was taken with the specific intent of interfering with the employee's ERISA benefits." Id. at 66 (quoting Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995)). In order to establish a prima facie case under section 510, a plaintiff must present sufficient evidence from which the employer's specific intent to interfere with the plaintiff's benefits can be inferred, meaning that he must show that he (1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. Barbour, 63 F.3d at 38. Once the plaintiff establishes a prima facie case, a

presumption arises that the defendant acted unlawfully in denying the plaintiff ERISA benefits.

Id.  In the ERISA context, the defendant's burden at stage two is to establish a legitimate, "non-discriminatory" reason – i.e., one unrelated to the plaintiff's entitlement to ERISA benefits – for its actions toward the plaintiff.  Id.  Once the defendant has met its burden of production, the presumption of intent established by the plaintiff's prima facie case "drops out of the picture." Id. at 39 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, ----, 113 S.Ct. 2742, 2749 (1993)).  The burden of production then shifts back to the plaintiff, who must prove that the defendant acted with the specific intent of interfering with the plaintiff's benefits. Id. Thus, in order to survive a motion for summary judgment, a plaintiff must introduce evidence sufficient to support two findings: (1) that the employer's articulated reason for its employment actions was a pretext; and (2) that the true reason was to interfere with the plaintiff's receipt of benefits. Id.

The Court need not linger long over a separate analysis of the ERISA claim, as the analytical framework and the vast majority of the evidence and defenses are overlapping. Initially, the Court notes as was the case with the ADEA claim (see supra at 15 ff.), the ERISA claim depends for its proof of pretext and specific intent upon interpretation of the CBA, and appears to be the dismissed Section 301 claims re-cast on a statutory basis.  Such claims are barred, for the reasons discussed supra.

Moreover, for the same reasons that Idearc was entitled to summary judgment on the ADEA claim, the ERISA claim also fails.  Idearc has advanced a legitimate non-discriminatory reason for its terminations of the Plaintiffs (i.e., that they were subject to termination because of their failure to meet the MSP performance standards enshrined in the CBA).  The Plaintiffs have failed to adduce evidence from which a reasonable jury could conclude that that reason was

pretextual, and masked a specific intent to interfere with the Plaintiffs' benefits.

A few points specific to the ERISA claim bear analysis. The Plaintiffs point to the fact that the Union's 30(b)(6) deponent testified that during collective bargaining in 2007, the company and the union discussed the continuance of the pension plan benefits, and that as of December 31, 2007, the pension plan was amended to prohibit additional employees from becoming participants in the Plan and to cease all benefit accruals under the Plan. Docket # 114, at ¶¶ 67-68. The Plaintiffs, citing these two facts, then make the significant leap that "this is evidence that these 14 to 28 year employees who were close to attaining service and deferred vested pension milestones were identified for termination, by using the hyper-inflated MSP in order to cut down those same pension costs" sufficient to create a triable fact with regard to Idearc's intent. Docket # 113 at 19. This is not a reasonable inference from these discrete facts, nor does any other record evidence support such an inference.

As noted supra, there was no significant difference in the proximity of qualification for service pensions between those employees whose appeals were granted, and those who were denied (67 months from the time of decision, and 68.18 months, respectively). Docket # 104 at ¶ 76 (citing Docket # 107 at ¶ 43); Docket # 114 at ¶ 76. Two employees whose appeals did not meet the criteria established in Article 46 of the CBA for relief from the Plan were nevertheless permitted to retain their employment when the Union called to Idearc's attention (via the grievance process) that their discharge would occur in close proximity to their qualification for a service pension. Docket # 104 at ¶ 71 (citing Docket # 107 at ¶¶ 36, 46): Docket # 114 at ¶ 71. This undisputed evidence directly contradicts the Plaintiffs' core assertion that the MSP was applied in a manner designed to target older employees as a means of preventing them from

qualifying for their pensions.

<u>ERISA Claim - Retaliation Theory</u>

Finally, the Plaintiffs' Supplement to the Amended Complaint alleges that Idearc retaliated against them for the December 3, 2008, filing of this lawsuit by concealing from them the 2008 CBA, which contained a June 24, 2007 Letter Agreement (a/k/a "the Page 53 Letter") entitling the Plaintiffs to reinstatement, and by delaying an arbitration which they argue would have reinstated O'Keefe. Docket # 79-1.

The ERISA claim on the retaliation theory fails for the same reasons. First, it is a Section 301 claim (depending upon interpretation of the CBA) recast as a statutory claim. Second, there is no record evidence supporting the proposition that the actions taken were taken for the purpose of retaliating against the Plaintiffs with respect to their retirement benefits. The only competent record evidence, in fact, suggests the opposite.

Individuals who were involved with the insertion of the Page 53 Letter into the 2008 CBA testified under oath (and affirmed in support of the pending motion) that the proposal therein no longer had any application to the Plaintiffs at the time of its insertion into the 2008 CBA (although it would have applied to the Plaintiffs had agreement on a new CBA been reached by June 24, 2007).[12] Docket # 116-19 at 12; Docket # 138 at ¶¶ 32-41; Docket # 116-15 at 9-15. The Plaintiffs have adduced no competent evidence to rebut these assertions. The only evidence adduced by the Plaintiffs with regard to the February, 2009, postponement of an

---

[12] Although not necessary to the result, the fact that in the course of the failed negotiations, Idearc proposed a mechanism that would have resulted in the reinstatement of the Plaintiffs further undermines the Plaintiffs' assertions that Idearc was motivated by a discriminatory purpose.

arbitration hearing relating to Plaintiff O'Keefe is that it came two or three months after the filing of the lawsuit. This is insufficient to raise a triable issue with regard to its motivation to interfere with the receipt of O'Keefe's retirement benefits.

III.     CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Defendant Idearc Media Corp. (Docket # 102) is ALLOWED.

The Motion to Strike Plaintiffs' Expert (#134) is ALLOWED insofar as the expert purports to render legal opinions and in all other respects DENIED.

The Motion to Strike Untimely Affidavits (#144) is DENIED.

SO ORDERED.

_____/s / Leo T. Sorokin_____
UNITED STATES MAGISTRATE JUDGE